IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANDRE BRAZZLE,<br><br>    Plaintiff,<br><br>v.<br><br>WASHINGTON CITY,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.  2:09-cv-00074-EJF<br><br>Magistrate Judge Evelyn J. Furse |

## I.  INTRODUCTION

Defendant Washington City moved the Court for Summary Judgment on Plaintiff Andre Brazzle's remaining claims for relief, specifically, Mr. Brazzle's claims of Hostile Work Environment in violation of both Title VII and 42 U.S.C. section 1981.[1]  The Court has carefully reviewed the original submissions of the parties and determined it does not need oral argument on this motion.  DUCiv R 7-1(f).

Washington City contends no genuine dispute as to any material fact exists.  Washington City asserts that this Court should grant Summary Judgment because no reasonable person could conclude that Mr. Brazzle's work environment rose to the level of actionably hostile.  Additionally, Washington City asserts that Mr. Brazzle failed to use the available reporting

---

[1] The parties have consented to jurisdiction by the undersigned Magistrate Judge.  (ECF No. 104.)  The parties stipulated to dismiss the Third, Fourth, and Sixth Causes of Action to Plaintiff's Amended Complaint throughout the course of litigation.  (ECF No. 47-48, 62-63.)  Magistrate Brooke C. Wells granted partial Summary Judgment on Plaintiff's Fifth Cause of Action. (ECF No. 53.)  Defendant Washington City filed for Summary Judgment on Plaintiff's remaining causes of action on February 17, 2010.  (ECF No. 64.)  Plaintiff filed Bankruptcy, and the Court closed the case on administrative grounds on September 2, 2011.  (ECF No. 97-98.)

mechanisms and that Mr. Brazzle cannot otherwise prove that the race-based harassment, of which he complains, occurred, pursuant to Washington City policy or custom.  Mr. Brazzle responds that he has set forth sufficient evidence to withstand the Motion for Summary Judgment and that disputed issued of material fact exist, necessitating a trial on the remaining causes of action.  Accordingly, the Court finds Mr. Brazzle has provided evidence from which a reasonable jury could conclude the alleged harassment rose to a level of sufficiently severe or pervasive such that it altered the conditions of his employment and created an abusive work environment under Title VII.  Furthermore, Mr. Brazzle has put forth sufficient evidence from which a reasonable jury could conclude Washington City had a custom of discriminatory employment practices.  On those bases, the Court DENIES the motion for Summary Judgment.

## II.  STANDARD OF REVIEW

Fed. R. Civ. P. 56 authorizes summary judgment where no genuine, disputed, triable issues of material fact remain in the case.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322-23 (1986).  "[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Summary Judgment allows the Court and the parties to isolate and dispose of factually unsupported claims or defenses.

---

Once the bankruptcy proceedings ended, this Court reopened the case pursuant to motion.  (ECF No. 102.)

A party asserting a fact must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

In deciding a motion for summary judgment, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Burke v. Utah Transit Auth.*, 462 F.3d 1253, 1258 (10th Cir. 2006) (quotation omitted). The Court, therefore, focuses on whether, based on that evidence and those inferences, reasonable jurors "can properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed." *Liberty Lobby*, 477 U.S. at 252 (emphasis in original, quotation omitted). With this standard in mind, the Court sets forth below the facts viewed in a light most favorable to Mr. Brazzle.

### III. <u>FACTUAL BACKGROUND</u>

The parties do not dispute the following facts. Washington City, a Utah municipal corporation, employed Plaintiff Andre Brazzle as a police officer from December 26, 2005 to September 2, 2008, when it terminated his employment.

At the time Washington City hired Mr. Brazzle, it had just begun to form its public safety department. An interview panel reviewed Mr. Brazzle's application prior to requesting an interview. Chief Keith made the final decision to both hire and fire Mr. Brazzle. Four individuals at Washington City Police Department had supervisory authority over Mr. Brazzle: Chief Keith, Sergeant Bithell, Sergeant Bailey, and Roger Carter, the City Manager.

As part of the hiring process with Washington City, Mr. Brazzle received a copy of Washington City's employee handbook. The employee handbook contains Washington City's

Equal Employment Opportunity policy, the City's prohibition on retaliation against anyone reporting prohibited discrimination, and provides a description of other forms of discrimination and harassment aside from sexual harassment. The handbook provides Washington City's procedure for reporting alleged incidences of harassment or discrimination. Additionally, the handbook also requires that any supervisor who receives a report of, information concerning, or otherwise observes discriminatory or harassing conduct shall immediately report the same to the human resource director.[2]

---

[2] Human Resource Director Ruth Holyoak testified that if an employee told a supervisor "I think I have been discriminated against," it is the supervisor's responsibility to report the statement to Human Resources. (Ruth Holyoak Dep. 70:25-71:12, ECF No. 76-3.) The Washington City employee handbook provides as follows:

> **Equal Employment Opportunity Policy**: The City is an equal employment opportunity employer. The City prohibits any discrimination based on race, color, religion, creed, national origin, sex, disability, veteran status, age, or any other characteristic protected by applicable law. Discrimination is prohibited throughout all phases of your employment—including being interviewed, hired, promoted, compensated, bonuses, benefits, hours of work, issuance of discipline, promotion, transfer, work assignments, and termination.

> The City prohibits retaliation against anyone who has reported prohibited discrimination. The City's policy is to investigate any complaints of unlawful discrimination and to take any necessary corrective action, up to and including termination. It is also the City's policy to ensure against and to take corrective action against employees who harass, embarrass, or retaliate in any respect against one who has made a complaint regarding unlawful discrimination.

The Handbook also provides:

> **Other forms of Discrimination and Harassment**. As set forth in the City's Equal Employment Opportunity Policy, discrimination and harassment in the workplace is not limited to sexual harassment. Discrimination and harassment may take many different forms, all of which are prohibited by the City. This conduct may include, but is not limited to:
> - Verbal harassment, innuendos, suggestive jokes, or offensive language or gestures about an individual's race, religion, or disability;

Officers within the department gave each other nicknames. Some officers nicknamed Mr. Brazzle "Hightower" from the *Police Academy* movie. Two other officers had nicknames from the *Police Academy* movie, including "Mahoney" and "Tackleberry." Other officers received nicknames from other movies and television shows, such as "Mater" from the movie *Cars*; "Mr. Burns" from *The Simpsons*; and other names like "Beaker" and "Squirrely." Co-worker's affixed these names to particular officer's drawers in the patrol room at Washington City. (Matthew Page Dep. 43:13-24, ECF No. 65-1; Christopher Ray Dep. 109:5-110:6, ECF No. 65-1.)

---

- Displaying, forwarding, or posting in the workplace any printed or visual material (including material on computer monitors and emails) about an individual's race, religion, or disability which is obscene or offensive or might be viewed as such by other individuals.

**Reporting Harassment or Discrimination**. Any employee who feels that he or she has been subjected to sexual harassment or other forms of discrimination or harassment should immediately report the incident to his or her immediate supervisor. Any employee who observes conduct which he or she feels constitutes sexual harassment or any other form of harassment or discrimination should immediately report the incident to his or her immediate supervisor. If reporting an incident to an immediate supervisor would make any employee uncomfortable, or if the employee's immediate supervisor is the individual whom the employee believes is engaging in the offending conduct, the employee should report the incident to the HR Director.

Any supervisor who receives a report of, information concerning, or otherwise observes conduct which may constitute sexual harassment or any other form of discrimination shall immediately report the same to the HR Director regardless of whether or not the supervisor believes the incident or conduct involved constitutes harassment or discrimination. Any supervisor who fails to report any such incident or conduct of the HR Director may be subject to disciplinary action as set forth in this Handbook, up to and including termination.

The City will treat all complaints as confidentially as possible. The City will investigate each complaint of harassment or discrimination and take appropriate action as warranted by each situation, including possible disciplinary steps or termination.

Mr. Brazzle, other officers, and the dispatch staff often spoke to each other over an instant message system. Mr. Brazzle and other officers and dispatch staff sent messages, and engaged in conversations with racial connotations.[3] The conversations are outlined as follows[4]:

| Date | To | From | Message |
|------|-----|------|---------|
| 12-19-06 | Abrazzle | Shaws | Listen Gary Coleman when I want your opinion I'll slap you for it. |
| | Hhatch | Abrazzle | Yup |
| 12-22-06 | Abrazzle | Callinson | Gary Coleman is waiting for you |
| | Callinson | Abrazzle | What u talkin bout willis? |
| | Abrazzle | Callinson | :) don't forget cute little webster |
| 3-21-07 | Abrazzle | Aburnett [D] | Yeah you missed out… there were famous people there… |
| | Aburnett[D] | Abrazzle | Oh and it was good food |
| | Abrazzle | Aburnett [D] | If you were starving why didn't you go with us? |
| | Aburnett [D] | Abrazzle | Just teasing, what famous people gary coleman. |
| 5-12-07 | Abrazzle | Esulliva | My legs are to pasty white Almost blinding |
| | Esulliva | Abrazzle | Tan |
| | Abrazzle | Esulliva | I cant I only burn Turn bright red, peel and then am back to my normal pasty white Its terrible I tried lotions, spray ones, tanning beds, |

---

[3] The instant message system references messages, both sent and received by Mr. Brazzle. (Kristi Hunsaker Decl.,   ECF No. 76-9; Electronic Communications Report by Conversation, ECF No. 65-2; Keith Decl. ¶ 8, ECF. No. 65-2.)

[4] For clarity, the Court has identified when a conversation was held with a dispatcher, by indicating "D" behind the name. Unless otherwise noted, the instant messages are between officers. Chief Keith testified as to his familiarity with dispatchers Kierston Oldroyd and Analee Burnett. (2d. Keith Decl. ¶ 4, March 16, 2011.)

| | | | |
|---|---|---|---|
| | Esulliva | Abrazzle | laying out, crayons, markers<br>None of them work<br><br>That's not good |
| | Abrazzle | Esulliva | Your telling me<br>A life without shorts or skirts… it gets hot in the summer |
| | Esulliva | Abrazzle | |
| | Abrazzle | Esulliva | Have you seen my tan<br><br>Can you tan? |
| 5-12-07 | Sdurfey, Kbell, Dcordner | Abrazzle | Chicken make black man +o( |
| | Sdurfey, Kbell, Dcorner, Abrazzle | Kbell | Lol |
| | Sdurfey, Kbell, Dcorner, Abrazzle | Dcorner | Refried beans makes whitemans shorts brown |
| | Sdurfey, Kbell, Dcorner, Abrazzle | Abrazzle | Lol |
| | Sdurfey, Kbell, Dcorner, Abrazzle | | |
| 5-27-07 | Abrazzle, Dcorner, Jchristensen | Mpage | You dirty Andre<br>Its terrible Andre |
| | Mpage, Abrazzle, DCordner | Abrazzle | What you talking about Willis |
| | Mpage, Abrazzle, Dcordner | Dcordner | Is the office smellin |
| | Mpage, Abrazzle, Dcordner | Mpage | Oh my lord he left the door wide open and the fan off…I have no problem signing as a witness to a write up |

| | | | |
|---|---|---|---|
| 6-10-07 | Abrazzle | Koldroyd [D] | Why did you ask annalee if I was african american lol |
| | Koldroyd [D] | Abrazzle | You sound african american, on the radio |
| | Abrazzle | Koldroyd [D] | Really? How so? |
| | Koldroyd [D] | Abrazzle | You have an accent, that makes you sound like one of the sisters :) |
| | Abrazzle | Koldroyd [D] | haha I have an accent? Could have fooled myself… lol |
| | Koldroyd [D] | Abrazzle | well you probably, cant tell, but I can, do you have anyone in your family, with a different heritage, check your family tree, you might have some cousins that were black way back when |
| 8-13-07 | Dcordner | Abrazzle | I found a brother at wal-mart |
| | Abrazzle | Dcordner | Really |
| | Dcordner | Abrazzle | Going 82 |
| | Abrazzle | Dcordner | 4 what |
| | Dcordner | Abrazzle | im supposes to be the only brother around here |
| | Abrazzle | Dcordner | :-| |
| 10-6-07 | Rericksen | Abrazzle | Tell um the bllack cop says hi :-D |
| | Abrazzle | Rericksen | I will |

(Electronic Communications Report by Conversation ECF No. 65-2.)

| Date | To | From | Message |
|---|---|---|---|
| 4-6-07 | Abrazzle | Aburnett [D] | Sounds like a plan<br>Have a good night monkey king |
| | Aburnett [D] | Abrazzle | Lol<br>k |
| | | Aburnett | [google image inserted: monkey/smiling] |

| | Abrazzle | [D] | sorry couldn't help it |
|---|---|---|---|
| 4-19-07 | Abrazzle | Aburnet [D] | Im just teasing<br>Gosh monkey |
| | Aburnett [D] | Abrazzle | :-P |
| 6-5-07 | Dcordner, Abrazzle, Jchristensen, Kbell, Sdurfey | Dcordner | The blackenator |
| 10-17-07 | Aburnett [D] | Abrazzle | All about the skilllllllllllssssssss |
| | Abrazzle | Aburnett [D] | Lol…. Oh I see<br>8-)<br>the skills…. yeah right!<br>Only monkeys have skills |
| | Aburnett [D] | Abrazzle | Jealous<br>Dirty |
| | Abrazzle | Aburnett [D] | Im not jealous…. I promise<br>And the monkey king thing was a joke! |
| 6-23-07 | Abrazzle | Koldroyd [D] | So what does a brother like you do for fun? |
| | Koldroyd [D] | Abrazzle | Movies, video games, bike riding, board games, all of the above, and you |
| 5-11-08 | Abrazzle | Koldroyd [D] | Wasup brotha |
| | Koldroyd [D] | Abrazzle | Nothing much how you been |
| 6-21-08 | Aburnett [D] | Abrazzle | Need some cheese with that wine<br>Lol |
| | Abrazzle | Aburnett [D] | Shut it monkey<br>:-D |

(Electronic Communications Report by Conversation ECF No. 76-9.)

The Department demoted Mr. Brazzle to new-hire probation status for an incident where

9

Officers found Mr. Brazzle in the back seat of his personal vehicle with a female dispatcher, after a member of the public called in a suspicious vehicle. (Brazzle Dep. 138:4-23, ECF No. 65-1.) The Department took corrective action against Mr. Brazzle on May 9, 2008, based on inadequate and unsatisfactory work performance as a police officer. Mr. Brazzle had to follow a sixteen-week corrective action plan for violating the code of conduct, gossiping, failing to take responsibility for his actions, and for using poor judgment. (ECF No. 65-2.) On April 4, 2006, Washington City informed Mr. Brazzle it had initiated an internal affairs investigation for misconduct. The internal affairs investigation revealed that Mr. Brazzle's actions occurred off-duty and that while he may not have used good judgment in the situation, his conduct did not violate any departmental or city policy.

Washington City terminated Mr. Brazzle's employment on or around September 2, 2008. Mr. Brazzle appealed his termination. (Roger Carter Dep. 141: 22- 142:6, ECF. No. 65-2.) Between September 8, 2008 and September 10, 2008, the City Manager determined Mr. Brazzle could not appeal his termination.[5] (Carter Dep. 142:1-18, ECF No. 65-2.)

In addition to the uncontroverted facts, Mr. Brazzle submits evidence to support the following facts:

Mr. Brazzle was the only African-American police officer employed by Washington City, and the only African-American individual who has applied for employment since the date of inception for Washington City's public safety department.[6] When Washington City hired Mr.

---

[5] Chief Keith and Roger Carter made the determination that because Mr. Brazzle was on disciplinary probation he could not appeal his discharge. (Carter Dep. 142:17-24, ECF No. 65-2.)

[6] Roger Carter, Washington City's manager, could not identify any other African-American employees, though he thought the City employed up to twelve or fifteen other African-Americans, but he could not recall specific departments within the City. (Carter Dep. 47:14-18; 48: 5-9, 25; 49:1-50:8, ECF No. 76-1.)

Brazzle, the police department employed approximately fourteen full-time police officers, plus upper management staff.[7]

Washington City provided annual training on its harassment and discrimination policies to employees of the public safety department but they only covered sexual harassment and did not address reporting.[8] All of the certificates provided to the Court specifically reference "sexual harassment" training. (*See* ECF No. 76-10.)

Mr. Brazzle reports he suffered substantial racial disparity and treatment within his department. During his tenure as a police officer with Washington City, Mr. Brazzle recalls several specific episodes or comments made by co-workers and management staff, that he considered negative or offensive. For example, Mr. Brazzle reports members of the department subjected him to a "barrage of racist comments." He specifically recalls Sergeant Alduenda directing a racial comment toward him when Mr. Brazzle first began with the department, however, he could not recall the specifics of the conversation. (Brazzle Dep. 37:22-38:23, ECF No. 81.)

Additionally, Officer Kounalis coined the term "Black-A-Nator" and directed the comment at Mr. Brazzle, referring to Mr. Brazzle as the "Black-A-Nator" every other day or so, when the two officers worked the same shift. (Brazzle Dep. 42: 1-25, ECF No. 65-1.) Other officers, including Officers Matt Page and C. Ray also called Mr. Brazzle the "Black-A-Nator,"

---

[7] For this reason, Mr. Brazzle reports that, because the department only employed fourteen sworn police officers, half of the entire department subjected him to harassment.

[8] Ruth Holyoak, the Human Resource Director for Washington City, testified that she could not recall any specific examples given during annual harassment training to City employees on what may constitute inappropriate racial harassment. (Holyoak Dep. 50:11-51:8, ECF No. 76-3.) Mr. Brazzle testified that training focused on sexual harassment, and provided no reporting information. (Brazzle Dep. 39:1-40:10, ECF No. 65-1.)

both to his face and in general reference. (Brazzle Dep. 19:1-8, 44:18-25, ECF No. 65-1.) Though Mr. Brazzle could not recall specifically how many times his co-workers referred to him as "Black-A-Nator", he indicated it was "more times than—probably more time—more than ten times, I know that much . . . lots of times." (Brazzle Dep. 43:1- 44:25, ECF No. 76-5.) Mr. Brazzle also testified that Sergeant Cordner was in the briefing room on several occasions when the other officers called Mr. Brazzle "Black-A-Nator." (Brazzle Dep. 45:9-15, ECF No. 76-5.) Officer McKinney specifically recalled Mr. Brazzle being called "Black-A-Nator" at the 2006 Christmas Party. Officer McKinney recalled that during the Christmas Party, Mr. Brazzle's coworkers had put together a slide show, and one of the slides depicted Mr. Brazzle as a superhero labeled "Black-A-Nator." (Jeffrey McKinney Decl. ¶14, ECF. No. 76-8.)

In another incident, unknown co-workers affixed a sign to Mr. Brazzle's assigned drawer in the patrol room with the name "Hightower." Hightower references an African-American police recruit from the *Police Academy* movies from the 1980s. Mr. Brazzle became angry and upset at the reference and crossed out the name completely with a marker within two days of the sign's appearance, only to find it replaced within a week. (Brazzle Dep. 50:11-52:13, ECF No. 76-5.)

Mr. Brazzle's fellow officers would joke about Mr. Brazzle's race, by making jokes and doing things like looking up Internet pictures of Gary Coleman. (Brazzle Dep. 56:12-20, ECF No. 65-1.) Officers Page and Erickson told Mr. Brazzle on multiple occasions that he needed to keep his patrol car windows rolled down and smile in order for people to see Mr. Brazzle in his vehicle. These officers made these comments directly following the department having the patrol car windows tinted, referencing the need for Mr. Brazzle's teeth to show, because of the dark color of his skin. Mr. Brazzle told the officers he did not find their comments funny and

drove away. (Brazzle Dep. 59:14- 60:13, ECF No. 65-1.) Officer Page told Mr. Brazzle that Mr. Brazzle should not drive a patrol car any longer because citizens might think Mr. Brazzle stole the vehicle. (Brazzle Dep. 63:9-18, ECF No. 65-1.) Officer McKinney witnessed these incidents. (McKinney Decl. ¶11, ECF. No. 76-8.) Sergeant Bithell once called Mr. Brazzle "brotha." Sergeant Bithell told Mr. Brazzle he did not mean anything by the comment, but Mr. Brazzle did not engage in conversation with Sergeant Bithell. Rather, he immediately walked out of the patrol room. (Brazzle Dep. 55:2-22, ECF No. 65-1.)

In another incident during Washington City's Cotton Days celebration, Mr. Brazzle reported for briefing in the patrol room, and Officer Page told Mr. Brazzle that he should run and hide or he would have to pick cotton, referencing African-American slaves picking cotton in the deep south, pre-Civil War. Mr. Brazzle testified that either Sergeant Cordner or Alduenda held the briefing and both were present during the incident. After the comments, officers in the patrol room laughed. (Brazzle Dep. 63:22-65:18, ECF No. 65-1.) Officer McKinney swore that Officers Kounalis, Page, Erickson, himself, and Brazzle heard Officer Koundalis suggest that Mr. Brazzle dress as a slave for the police department float in the Cotton Days parade and throw cotton to the crowd. Officers Kounalis, Page, and Erickson laughed at the suggestion. (McKinney Decl.¶18, ECF. No. 76-8.)

Another incident occurred during a safety presentation at the Washington County Community Center, instigated by and witnessed by members of the department, including Chief Keith, Lieutenant Kantor, Sergeant Bithell, and Officer Page. Sergeant Bithell and Officer Page began laughing while speaking with each other. When Mr. Brazzle asked them what they found funny, the two told him, "we should throw you in the middle of the floor and Rodney King you," referencing the incident in Los Angeles where white police officers brutally beat an African-

American man in the street, sparking race riots in Los Angeles in 1992. (Brazzle Dep. 65:20-66:25, ECF No. 65-1.)

Mr. Brazzle was also offended when Officer Page created a cartoon-like drawing of Mr. Brazzle, depicting him in reference to a traumatic automobile accident Mr. Brazzle had responded to where a Hispanic male had been ejected from a vehicle and was severely injured or killed. Officer Page turned the drawing into a screen saver, which appeared on the patrol room computers for at least a week. The screen saver cartoon depicted Mr. Brazzle as a hysterical person, dressed like a "gang member," using street slang. The words from the cartoon's mouth read: "Back up all of you, I'll shoot you mother flippers. Control 643. Get me Highway Patrol. This sucka is dead." ECF No. 65-2. Officer McKinney believed that Officer Page was making fun of Mr. Brazzle's race. McKinney Decl. ¶15, ECF. No. 76-8. During this week, anyone who entered the patrol room could see the screen saver. (McKinney Decl. ¶15, ECF. No. 76-8.) Officer McKinney thought the pictures were "pretty messed up." (Brazzle Dep. 75:21-76:18, ECF No. 65-1.) Officer Page testified that he meant the picture to be funny and that he was trying to lighten the mood because Mr. Brazzle had been pretty shaken up after responding to the accident because Mr. Brazzle had not previously witnessed a traumatic scene on duty. (Matthew Page Dep. 45:1-46:16, ECF No. 65-1.)

Additionally, Washington City uses a CAD system, a communication device that links dispatch and the police officers for tracking updates and assist with response to police calls. Mr. Brazzle testified that on one particular date, he logged into the CAD system and saw the name "Radio" where his login information typically appeared. Only dispatchers for Washington Police Department have the ability to change the display. Mr. Brazzle felt the "Radio" display

referenced the movie *Radio*, depicting a mentally disabled African-American individual played by actor Cuba Gooding Jr.

Mr. Brazzle testified that when co-workers directed racial comments or jokes toward him, he would leave the room. He often left the building. (Brazzle Dep. 44:8-12, ECF. No. 65-1.) During his time with the department, Mr. Brazzle became quiet and withdrawn, often working by himself away from other officers. He stopped writing reports in the patrol room and left rooms occupied by other officers. (McKinney Decl. ¶¶7, 10, ECF. No. 76-8.)

Mr. Brazzle testified that often, managing officers were present when co-workers directed racial comments towards him. For example, Sergeant Cordner was in the briefing room at times when coworkers called Mr. Brazzle "Black-A-Nator." (Brazzle Dep. 45:9-15, ECF No. 65-1.) The drawing Officer Page posted appeared on computer screens in the patrol room for more than a week, where officers, staff, and management could see it. Mr. Brazzle indicated he had a copy printed and showed Sergeant Cordner. Additionally, the name "Hightower" was affixed to Mr. Brazzle's drawer in the patrol room where staff, officers, and management could see it. (Brazzle Dep. 51:4-52:7, ECF No. 65-1; McKinney Decl. ¶12, ECF. No. 76-8.)

Further, Mr. Brazzle testified he did not feel comfortable reporting the racial slurs, comments, and harassment to his supervisors because he worried his fellow officers would not provide back-up to him on police calls. Specifically, he stated, "[t]hese are guys that made racial slurs to me constantly, I presume. These are guys that—have to have my back on—have to have—I depend on them to back me up on a daily basis here. They weren't already talking to me. I rode solo a lot of times. Ate by myself a lot of times . . . [t]hen I have the chief here who's coming down every so often asking me, Are you ready to resign? Are you ready to resign? Are you ready to resign? So I'm going to him with this? To who? Ruth Holyoak, too?

You know, I felt --- I kept it to myself."  (Brazzle Dep. 61:1-20, ECF No. 76-5.)  Mr. Brazzle also testified that at least two sergeants and other staff heard or participated in the incident where one suggested the officers would "Rodney King" him, including Chief Keith, Sergeant Bithell, and Officer Page.  (Brazzle Dep. 66:3-25, ECF No. 65-1.)

Mr. Brazzle also asserts the Department denied him training and other career opportunities during his employment with Washington City.  For example, Mr. Brazzle requested bicycle patrol, but Officer Durfey received the position.  When Mr. Brazzle inquired as to why he did not receive the assignment, Sergeant Cordner told him Officer Durfey had "written good reports."  (Brazzle Dep. 87:21-88:6, ECF No. 65-1.)  In another incident, Sergeant Bithell asked who would like to take EMT training at the Fire Department replacing an officer who had left.  Mr. Brazzle volunteered but never heard back on the placement, despite no one else volunteering.  (Brazzle Dep. 88:8-20, ECF No. 65-1.)

Mr. Brazzle asserts he did complain to Sergeant Bithell about discrimination in the Department but that no one took any action or followed up with him.  During week fifteen of Mr. Brazzle's corrective action plan, Segeant Bithell noted that Mr. Brazzle had complained about discrimination but that Mr. Brazzle had indicated Sergeant Bithell had not discriminated against him.  (Brazzle Dep. 114: 7-21, ECF No. 65-1.)  Mr. Brazzle, however, reports he discussed with Sergeant Bithell the fact that Mr. Brazzle had grown tired of the police department discriminating against him, but then Mr. Brazzle told him he did not want to talk about it right then.  (Brazzle Dep. 115:2-22, ECF No. 65-1.)  Sergeant Bithell never followed up with either Mr. Brazzle or Washington City Human Resources regarding Mr. Brazzle's complaint.

Additionally, Mr. Brazzle reports that during his demotion and return to probationary status, he received consistently good marks, but the department terminated him prior to the end

of the period purportedly because he had asked his sergeant for clarification on whether or not he had cited a code provision correctly during a routine traffic stop.  During this same time period, another officer, Joe Barton, had received a similar probation period for refusing to respond to calls to back a fellow officer who testified against him in an internal affairs investigation.  The department did not terminate Mr. Barton, rather, it allowed Mr. Barton to finish his corrective action early.

## IV. DISCUSSION

Washington City moves for summary judgment asserting the alleged harassment did not rise to a level of pervasiveness necessary to create a hostile work environment.  Furthermore, Mr. Brazzle did not perceive any allegedly offensive conduct as hostile and abusive.  The City further argues that it bears neither vicarious liability nor negligent liability for the alleged harassment.  The Court addresses each argument in turn.

### A. Hostile Work Environment

Title VII provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII's scope includes a prohibition on hostile work environments based on race.  *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012).

"'To survive summary judgment on a claim alleging a racially hostile work environment, [the plaintiff] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and that the victim 'was targeted for harassment because of [his] race.'"

*Hernandez*, 684 F.3d at 957 (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012)).  The Court focuses on both an objective and subjective analysis of the work environment with consideration given to "all the circumstances," *Smith v. Nw. Fin. Acceptance Inc.,* 129 F.3d 1408, 1414 (10th Cir. 1997), and "the social context in which particular behavior occurs and is experienced by its target."  *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998).  The Tenth Circuit recognizes that "Title VII does not establish a general civility code for the workplace. . . . [R]un-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim."  *Morris*, 666 F.3d at 663-64 (internal quotations and citations omitted).

Determining the existence of a hostile work environment requires both objective and subjective components and asks "'whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended.'"  *Morris*, 666 F.3d at 664 (quoting 3 Lex K. Larson, Employment Discrimination § 46.05[3][e], at 46-93 (2d ed. 2011)).  However, "to prevail on the subjective component . . . the law does not require a plaintiff to show that the discriminatorily abusive work environment seriously affected [his] psychological well-being or that it tangibly impaired [his] work performance." *Davis v. U.S.P.S.,* 142 F.3d 1334, 1341 (10th Cir. 1998) (citations omitted).  No "mathematically precise test" exists to determine the subjective component.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

Washington City argues that the alleged harassment rose neither to the severity nor pervasiveness necessary to create a hostile work environment because no reasonable person could objectively find the alleged acts hostile or abusive.  Moreover, the City argues that Mr.

Brazzle did not subjectively perceive the alleged offensive conduct as hostile and abusive. Viewing all evidence in the light most favorable to Mr. Brazzle as the non-moving party, the Court concludes that a rational jury could find that discrimination, ridicule, and insult permeated Mr. Brazzle's workplace in a sufficiently severe or pervasive manner such that it altered his conditions of employment.

### i. Severe or Pervasive

To determine whether an environment rises to the level of hostile or abusive, courts look to such factors as "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris*, 510 U.S. at 23). Moreover, "the word 'pervasive' is not a counting measure," rather, the "trier of fact utilizes a broad contextual analysis." *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 680 n.3 (10th Cir. 2007) (quoting *Nieto v. Kapoor*, 268 F.3d 1208, 1219 n.8 (10th Cir. 2001) (quotation marks omitted)). "[T]he severity and pervasiveness evaluation [of the objective component] is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1098 (10th Cir. 1999) (internal citation and quotation marks omitted).

The City relies on *Bolden v. PRC Inc.*, where the court stated that "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." 43 F.3d 545, 551 (10th Cir. 1994). In *Bolden*, the court held that two overtly racial comments and one arguable racial remark over the course of the plaintiff's eight years of employment

did not constitute pervasive conduct.[9]  The City asserts that no hostile work environment existed because Mr. Brazzle did not have to sit through "daily abuse, pictures, jokes, or statements that were undeniably racist in nature and tone.  He was never called the 'N-word' or other similar racial epithets that offend most people, regardless of their race."  (Def.'s Supp. Mem. 25, ECF No. 65.)

In contrast, the facts of this case, viewed in a light most favorable to Mr. Brazzle, the nonmovant, resemble those examined in *Hernandez,* 684 F.3d 950.  The Tenth Circuit held the facts barred summary judgment in defendant's favor on plaintiff's hostile work environment claim, concluding  "at least a dozen racially offensive comments and jokes over the fourteen months" sufficed to "establish[] a genuinely disputed issue of fact as to the pervasiveness of the harassment in [the] work environment".  *Id*. at 958-59.  The comments included, among others:  "[D]o you know why Mexicans don't BBQ?. . . [B]ecause the beans go through the grill;"  "[D]o you know Mexicans and Latinos make tamales for Christmas? So they can have something to unwrap;"  "[P]ut ice in the cups.  You're not in Mexico anymore."  *Id*. at 954.  In addition to the Mexican-barbeque comment made three to five times, the tamales comment made three or four times, comments also included an accusation that the plaintiff's family member was a murderer because plaintiff had the same surname, and an accusation that plaintiff's family did not pay for lunch.  *Id*.  The Court found a rational jury could find a hostile work environment existed, thus sufficient evidence existed for plaintiff to withstand summary judgment.  *Id*. at 958.

Over the course of two years and nine months of employment with Washington City, fellow officers told Mr. Brazzle to keep his patrol car window down so people could see him

_____

[9]  The court found a Ku Klux Klan comment, the use of the n-word, and a "sad face

behind the tinted windows, and on at least another occasion that he should not drive his patrol car because someone would think he stole it because his race. Additionally, during a patrol briefing in preparation for the City's Annual Cotton Days Celebration, a co-worker told Mr. Brazzle, in the presence of at least one sergeant, that he had better run and hide or he would have to pick cotton. Another officer suggested Mr. Brazzle dress up as a slave and throw cotton at the crowd for the police department float. During a safety presentation at the Washington County Community Center, Officer Bithell informed Mr. Brazzle that his supervisor and coworker joked they should throw him to the middle of the floor and "Rodney King" him, in apparent reference to the 1991 beating of an African-American male by police officers in California. During Mr. Brazzle's employment his co-workers frequently referred to him by race-related names, the "Black-A-Nator," "Hightower," and "Brutha."

Frequency provides one factor the Court looks to in addition to the totality of the circumstances. Although Mr. Brazzle may not have heard racist comments on a daily basis as the City contends he must, he has presented evidence sufficient under Tenth Circuit precedent to allow a rational jury to conclude he worked in a hostile work environment. A jury could rationally conclude that consistently referring to an individual by names based solely on his race, directing an individual to dress up as a slave and throw cotton at a crowd, and threatening to beat him like Rodney King suffices to alter the condition of the victim's employment and create an objectively abusive work environment.

### ii. Racial Animus & Unwelcomeness

Washington City also argues that Mr. Brazzle welcomed the alleged harassment and thus suffered no harm and that the actions/statements did not arise from racial animus. The

---

cartoon" over the eight-year period insufficiently pervasive. *Bolden,* 43 F.3d at 551.

City avers that the alleged conduct does not constitute harassment because it consisted of harmless jokes, common for the relevant work environment and social context. "[T]o constitute harassment the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Morton v. Steven Ford-Mercury of Augusta, Inc.,* 162 F. Supp. 2d 1228, 1238 (D. Kan. 2001) (internal quotation omitted).

The City contends Mr. Brazzle engaged in the same type of conduct of which he now complains. The City relies on *Burns v. Snow*, where the Tenth Circuit affirmed summary judgment where the plaintiff admitted to participating in the same conduct of which she complained: crude jokes, viewing pornographic materials with coworkers, discussing their sex lives. 130 F. App'x. 973, 983-85, 2005 WL 1140742 (10th Cir. May 16, 2005) (unpublished). Yet Mr. Brazzle's use of race-based terms in self-reference does not necessarily mitigate the harm in a supervisor or co-workers' use of similar terms and its impact in the work environment. *See Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (finding a supervisor's use of a racial epithet impacts the work environment far more severely than black employees' use of the term). Whether the IM comments Mr. Brazzle made in reference to his race or pop culture invite the alleged conduct, such as directing him to dress up like a slave and throw cotton, get beaten up like Rodney King, or stop driving the patrol car because someone would think he stole it, creates an issue of fact for the jury to decide.

Additionally, the City contends the behavior fell within the "social context of the law enforcement working environment where joking and name-calling were the norm among the officers." (Def.'s Supp. Mem. 26-27, ECF. 65.) In *Bolden v. PRC Inc.,* the court found

"intimidation, ridicule, and insult" permeated the plaintiff's workplace but that the behavior did not stem from racial animus and affirmed summary judgment for the defendants. 43 F.3d at 550-52.

Co-workers referred to Mr. Brazzle as "Black-a-Nator," "Hightower," "Brutha," and depicted him in a racially based drawing. While the City contends that such alleged incidents did not single out Mr. Brazzle because of contempt for his race but out of consistency with his race (Def.'s Supp. Memo. 21, ECF No. 65) or because the depiction was factually accurate (Def.'s Supp. Mem. 24, ECF No. 65), the Tenth Circuit has long held that "'[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct.'" *Hernandez*, 684 F.3d at 960 (quoting *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1097 (10th Cir. 1999)). *See also Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1263 (10th Cir. 1998) ("Even where the motive behind the alleged conduct was not the plaintiff's [race], the court may still consider that conduct relevant when evaluating whether ambiguous conduct was in fact [racially]-motivated or whether [racially]-motivated conduct was so severe [or] pervasive as to create Title VII liability"). "'[W]hat is important in a hostile environment claim is the *environment*, and [racially]-neutral harassment makes up an important part of the relevant work environment.'" *Hernandez*, 684 F.3d at 960 (emphasis in original) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005)). The jury must decide if the facially neutral harassment results from racial hostility. *Chavez*, 397 F.3d at 833. *See accord, Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) (noting disputes "about intent are best left for trial and are within the province of the jury.").

Viewing the evidence put forth in the light most favorable to Mr. Brazzle, a reasonable jury could conclude that Mr. Brazzle's work environment consisted of discriminatory intimidation, ridicule, and insult based on race sufficiently severe or pervasive to create an abusive working environment. Accordingly, the Court DENIES summary judgment as to the hostile environment claim.

## B. Washington City's Liability for the Harassment

Tenth Circuit precedent indicates supervisors and other employees do not have personal liability under Title VII, but a victim may obtain relief from the employer. *Haynes v. Williams*, 88 F.3d 898, 899 (10th Cir. 1996) (citing *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993)). An employee must establish a basis for employer liability for the conduct of its employees that creates a hostile work environment. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008) (noting need to prove liability against employer). Employers may have liability under three different theories: "[1] the negligence theory, under which the employer fails to remedy a hostile work environment it knew or should have known about; [2] the actual authority theory, under which an employee harasses another employee within the scope of his employment; or [3] the apparent authority theory, under which the harassing employee acts with apparent authority from the employer." *Tademy*, 614 F.3d at 1139 (quoting *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001)). *See also Wright-Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1269 (10th Cir. 1998) (discussing employer liability).[10] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (discussing employer liability rules drawn from traditional agency principles).

---

[10] The employer has the same liability for race or sex-based discrimination. *See Wright-Simmons v. City of Oklahoma City,* 155 F.3d at 1270 (noting that the principles established in sexual harassment cases apply with equal force to racial harassment cases).

Mr. Brazzle advances two theories: vicarious liability and negligence. The Court addresses each in turn.

### i. Vicarious Liability

An employer can have vicarious liability when the harasser acts as a supervisor, *i.e.* has the power to take tangible employment actions against the victim. *Vance v. Ball State University,* __ U.S.__, 133 S. Ct. 2434, 2439 (2013). When the employer has taken no tangible employment action the employer can avoid liability if it can meet the requirements of an affirmative defense based on the employer's lack of awareness of the problem. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). In this case, however, the City took a tangible employment action, terminating Mr. Brazzle. An employer may not claim this affirmative defense when a supervisor's actions "'culimate [] in a tangible employment act, such as discharge, demotion, or undesirable reassignment.'" *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, (10th Cir. 2009). (quoting *Burlington,* 524 U.S. at 765). Thus the City does have the affirmative defense available to it. The parties agree that Chief Keith, Sergeant Bithell, Sergeant Bailey, and City Manager Carter had supervisory authority over Mr. Brazzle. (City Brief at ¶16, ECF 65; Brazzle Brief at ¶16, ECF No. 76.) Thus, under the *Vance,* 133 S. Ct. at 2442, the City has strict liability given the tangible employment action. For that reason, the Court DENIES summary judgment on vicarious liability.

### ii. Negligence Theory

An employer also can have liability on a negligence theory "'if it knew or should have known about the conduct and failed to stop it." *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012) (quoting *Burlington Inds., Inc. v. Ellerth,* 524 U.S. 724, 759 (1998)). To prevail on the negligence theory of liability "the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not

adequately respond to notice of the harassment." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 673 (10th Cir. 1998) (citation and internal quotations omitted). "[T]he focus is not on whether the employer is liable for the bad acts of others, but whether the employer itself is responsible for failing to intervene." *Hollins*, 238 F.3d at 1258. Plaintiff cites incidences of actual or constructive knowledge of the hostile work environment, noting the accident depiction displayed on the computer screens in the patrol room and the picture print off shown to Sergeant Dennis Cordner. Sergeant Cordner was present during the briefing when an officer made the slave comment. Construing all influences in Mr. Brazzle's favor, as the Court must on Summary Judgment, the Court infers that Sergeant Cordner heard the comment.

Either Sergeant Bithell or Officer Page made the Rodney King comment during an event where Chief Donald Keith and Lieutenant Kantor were present; Sergeant Bithell informed Mr. Brazzle that members of the department should throw him [Brazzle] to the middle of the floor and Rodney King him. Sergeants Cordner and Bithell and Chief Keith had direct authority over Mr. Brazzle.

During an August 20, 2008 meeting with his then-supervisor Sergeant Vance Bithell, Mr. Brazzle stated that he felt discriminated against but stated he did not want to discuss the matter at that moment. Given the policies in the Washington City Employee Handbook, a rational jury could conclude Mr. Brazzle's statement that he felt discriminated against should have triggered Sergeant Bithell to report the information.

Viewing the evidence in the light most favorable to Mr. Brazzle, a reasonable jury could conclude that the City either should have known or did know about the harassment and failed to act. Accordingly, the Court DENIES summary judgment as to Plaintiff's negligence claim.

### C. Failure to Properly Plead the Section 1981 Claim

The City first argues Mr. Brazzle failed to plead the necessary elements of a section 1981 claim to impose liability on a municipal defendant. For a complaint to state a claim, it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotations omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

To state a claim for municipal liability for the actions of one of the municipality's employees, the plaintiff must allege sufficient facts to demonstrate the plausibility that a municipal policy or custom deprived the plaintiff of constitutional or other federal rights. *Moss v. Kopp*, 559 F.3d 1155, 1168-69 (10th Cir. 2009) (discussing municipal liability as to a § 1983 claim). A municipality cannot be held liable on a respondeat superior theory.[11] *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) (holding "a municipality cannot be held liable *solely* because it employs a tortfeasor." (emphasis in original)). Here, the Plaintiff's Amended Complaint does not rely solely on the conduct of Mr. Brazzle's co-officers but alleges high-level municipal employees, including Police Chief Keith created and maintained the hostile work environment. (Compl. ¶¶ 23, 58, 66.) The Amended Complaint also alleges that the City treated

---

[11]The analyses of municipal liability under sections 1983 and 1981 are interchangeable. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989).

the Plaintiff discriminatorily based on his race contrary to City Procedures.  (Compl. ¶¶ 40-42, 48-52.)  The Amended Complaint further alleges pervasive conduct that could plausibly reflect municipal custom.  (Compl. ¶¶ 20-38.)  Thus Mr. Brazzle sufficiently alleged municipal liability.  The Court DENIES summary judgment on this ground.

### D.  Section 1981 Claim

The elements of a hostile work environment claim under section 1981 are the same as under Title VII.  *Tademy*, 614 F.3d at 1152 (citation and internal quotations omitted).  However, for municipal liability to arise under section 1981, the plaintiff "must demonstrate that the City's officials acted pursuant to a 'custom or policy' of 'discriminatory employment practices.'"  *Carney v. City & County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 446 n.6 (10th Cir. 1995)).  As analysis of Mr. Brazzle's section 1981 claim mirrors the analysis of his Title VII claim, *infra*, the Court addresses only the additional requirements for imposition of liability under section 1981.

### i. Custom

In response to the City's Motion for Summary Judgment on the section 1981 claim, Mr. Brazzle argues that he has put forth sufficient evidence for a jury to conclude that City Officials acted pursuant to a custom of discriminatory employment practices.[12]  (Brazzle Br. 36-38, ECF No. 76.)  A "'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law."  *Marshall v. Columbia Lea Reg'l Hosp.*,, 345 F.3d at 1157,1177 (10th Cir. 2003) (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).  To establish a custom, the plaintiff must put forth evidence of "continuing, persistent and widespread" actions by the municipal employees.

---

[12] Mr. Brazzle does not argue that the City had a policy.  Therefore, the Court does not address that issue.

*Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).  To prove the existence of such discriminatory custom, "plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way," *Carney*, 534 F.3d at 1274, and a plaintiff's "failure to allege the existence of similar discrimination as to others seriously undermines [the] claim that the City maintained a custom of discriminatory personnel practices." *Randle*, 69 F.3d at 447.  However, the failure to train employees and the failure to investigate claims of harassment along with discriminatory practices "'so manifest as to imply the constructive acquiescence of senior policy-making officials" may suffice to prove custom.  *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2012).  *See also Bryson v. Cit of Okla.*, 627 F.3d. 784, 788 (10th Cir. 2010).  Additionally, where the evidence shows many employees "acted in concert" in violating a person's civil rights, a jury can draw a reasonable inference that they acted pursuant to custom.  *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir. 1989).

Mr. Brazzle's failure to produce sufficient evidence alleging the existence of similar discrimination as to others undermines his claim that the City maintained a custom of discriminatory personnel practices, as custom requires that the illegal practice be "widespread," *e.g.*, involving a "series of decisions."  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988).  However, Mr. Brazzle contends he cannot offer evidence that Washington City similarly mistreated other African-Americans because he was the only African-American employee in the police department, and likely the entire city.  Further, Mr. Brazzle has put forth evidence from which a rational jury could conclude the City failed to train on racial discrimination and failed to investigate a claim of racial discrimination and that many of his co-workers acted in concert to harass him based on his race.  Additionally, Mr. Brazzle has put forth

evidence from which a rational jury could conclude the City's policy-making officials

acquiesced in the discrimination. Given a rational jury could make those findings, it could find

the City liable under section 1981. Therefore, the Court DENIES the summary judgment as to

this claim.

## V. CONCLUSION

For the reasons stated above, the Court DENIES Defendant Washington City's Motion

for Summary Judgment.

SO ORDERED this 30th day of September, 2013.


BY THE COURT:

_Evelyn J. Furse_____
EVELYN J. FURSE
United States Magistrate Judge